UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ORTHO-CLINICAL DIAGNOSTICS BERMUDA CO.
LTD., a Bermuda exempted Limited Liability Company,
and ORTHO-CLINICAL DIAGNOSTICS, INC., a New
York Corporation,

                                        Plaintiffs,

                        - against -

FCM, LLC, a Delaware Limited Liability Company, and
MITCHELL HABIB, an Ohio resident,

                                        Defendants.

No. 15 Civ. 5607 (NRB)
ECF Case

**ORAL ARGUMENT
REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
Aidan Synnott
Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000
Fax  (212) 757-3990

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    Carlyle's Acquisition of OCD from J&J ................................................................ 2

    B.    The May 2014 OCD-FCM Engagement Agreement ............................................ 2

    C.    FCM's Work Under the Engagement Agreement ................................................. 4

    D.    The March 2015 Settlement ................................................................................... 6

ARGUMENT ........................................................................................................................... 8

I.    THE SETTLEMENT RELEASED ALL OF PLAINTIFFS' CLAIMS ........................... 8

    A.    The Settlement Released All Known Claims Related to
          FCM's Work on the Engagement Agreement ...................................................... 8

    B.    The Proviso for Unknown Claims Does Not Swallow the Release ...................... 9

    C.    All Plaintiffs' Claims Were Known ..................................................................... 11

          1.    OCD Knew About FCM's Qualifications and Abilities ........................... 11

          2.    OCD Knew About the Alleged Repudiation .............................................. 12

          3.    OCD Knew About FCM's Disputes with J&J ......................................... 13

          4.    OCD Knew that FCM Had Not Performed
               as Allegedly Promised or Represented ..................................................... 13

          5.    OCD Knew that Its Request for Access to
               FCM's Subcontractors Was Denied ......................................................... 15

    D.    Plaintiffs Fail Plausibly to Allege Post-Settlement Discovery
          of a Previously Unknown Claim ........................................................................... 15

    E.    Independently, the Settlement Released All Known Damages ............................ 17

CONCLUSION ...................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AngioDynamics, Inc.* v. *Biolitec, Inc.*,
    775 F.3d 550 (2d Cir. 2015) (per curiam) ........................................................................8

*APWU* v. *Potter*,
    343 F.3d 619 (2d Cir. 2003) ........................................................................8

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ........................................................................8

*ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................8

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ........................................................................8

*Brae Transp., Inc.* v. *Coopers & Lyrand*,
    790 F.2d 1439 (9th Cir. 1986) ........................................................................10

*Doyle* v. *Midland Credit Mgmt., Inc.*,
    722 F.3d 78 (2d Cir. 2013) (per curiam) ........................................................................8

*Int'l Audiotext Network, Inc.* v. *Am. Tel & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) (per curiam) ........................................................................3

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (Buchwald, J.) ........................................................................16

*Makarova* v. *United States*,
    201 F.3d 110 (2d Cir. 2000) ........................................................................8

*Mangini* v. *McClurg*,
    24 N.Y.2d 556 (1969) ........................................................................11

*Mennonite Bd. of Missions* v. *Adams*,
    462 U.S. 791 (1983) ........................................................................10

*In re Motors Liquidation Co.*,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) ........................................................................10

*Mullane* v. *Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ........................................................................10

*RBS Holdings, Inc.* v. *Wells Fargo Century, Inc.*,
   485 F. Supp. 2d 472 (S.D.N.Y. 2007) ....................................................................... 9, 10, 11

*Roth* v. *CitiMortgage Inc.*,
   756 F.3d 178 (2d Cir. 2014) (per curiam) ........................................................................... 4

*U.S. Rubber Co.* v. *United States*,
   160 F. Supp. 492 (Ct. Cl. 1958) (per curiam) ................................................................. 9, 10

*Wilshire Westwood Plaza LLC* v. *UBS Real Estate Sec., Inc.*,
   94 A.D.3d 514 (1st Dep't 2012) ........................................................................................ 10

*In re World Trade Center Disaster Site Litig.*,
   754 F.3d 114 (2d Cir. 2014) ............................................................................................ 8, 9

**Statutes**

Cal. Civ. Code § 1542 .............................................................................................................. 10

Fed. R. Civ. P. 7.1 ..................................................................................................................... 9

Fed. R. Civ. P. 12 .......................................................................................................... 1, 8, 18

**Other Authorities**

Restatement (Second) of Contracts § 253 (1981) ..................................................................... 12

Defendants FCM, LLC ("FCM") and Mitchell Habib ("Habib," and together with FCM, "Defendants") respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the July 17, 2015 Complaint ("Complaint") in its entirety and with prejudice.  As requested by the Court at the October 7, 2015 pre-motion conference, Defendants have limited this motion to the settlement release issue without prejudice to raising other issues later.

## PRELIMINARY STATEMENT

This dispute arose no later than November 2014 and was settled in March 2015. In exchange for that release, FCM gave up more than $23.2 million of the $38.2 million that Ortho-Clinical Diagnostics Bermuda Co. Ltd. ("OCD") then owed FCM under the original contract, and did so months after the sole bargained-for option for OCD to exit the contract had expired.  In addition, FCM continued to provide substantial transition assistance and turned over to OCD valuable intellectual property and other valuable rights.  Now, seizing upon a proviso for unknown claims, OCD asks this Court to believe that—despite demanding and receiving tens of millions of dollars of consideration—it had no knowledge of any claim prior to the settlement. But OCD's own allegations in the Complaint, and additional materials that this Court may consider, establish that OCD was well-aware of all of its purported claims all along.

Prior to the settlement, OCD knew about numerous alleged shortcomings and months of delays with the project.  OCD knew that FCM's primary subcontractor had allegedly been improperly managed, so much so that OCD "forced" FCM to replace its subcontractor. OCD knew that FCM had allegedly refused to support OCD's operations in certain countries, work purportedly promised under the contract.  OCD knew that there were significant disputes between FCM and Johnson & Johnson ("J&J").  And OCD knew that FCM had refused its

requests for access to FCM's subcontractors.  In the end, OCD allegedly decided that "enough was enough," that FCM had engaged in a "bait and switch," and that it "could not trust" FCM.

OCD knew sufficient facts to be aware of the claims in the Complaint.  That OCD may have learned a few additional facts allegedly in support of those known claims is insufficient to transform them into unknown claims.  If releases could be so easily avoided, then settlements could never be final.

In short, all of plaintiffs' claims were known, and thus released, and therefore should be dismissed with prejudice.

## STATEMENT OF FACTS

**A.    Carlyle's Acquisition of OCD from J&J**

In 2014, The Carlyle Group ("Carlyle"), a private equity firm, purchased OCD, a healthcare company, from J&J.  (Compl. ¶¶ 11-12.)  As a subsidiary of J&J, OCD's information technology ("IT") systems were owned by J&J.  (*Id.* ¶ 13.)  PricewaterhouseCoopers ("PwC"), OCD's "incumbent IT consultant," proposed a "big bang" approach—*i.e.*, to build OCD a completely new IT system.  (*Id.* ¶ 16.)  OCD solicited competing proposals, including from FCM.  (*Id.* ¶¶ 16-17.)  FCM proposed a "lift and shift" approach—*i.e.*, to copy J&J's existing IT systems.  (*Id.* ¶ 20.)

**B.    The May 2014 OCD-FCM Engagement Agreement**

FCM's proposal was submitted on May 7, 2014 and accepted by OCD on May 12, 2014 (the "Engagement Agreement").  (Compl. Ex. A pp. 2, 8 (using ECF Pagination).)  The Engagement Agreement outlines three broad "Objectives" (*id.* pp. 3-4), the scope of the engagement (*id.* p. 5), a proposed approach (*id.* p. 6), a schedule of timing and cost (*id.* p. 7), a description of the "tollgate" process (*id.* pp. 10-13), and a projection of OCD's post-transition IT structure (*id.* pp. 14-16).

FCM's total fee was to be $70 million, plus travel expenses.  (*Id*. p. 7.)  In addition, FCM disclosed that there would be additional costs "related to the participation of associates from OCD and J&J, who possess critical knowledge of legacy processes, infrastructure and applications that cannot be replicated by any third party."  (*Id*. p. 5.)  As another caveat, FCM noted that "some of the work necessitates access to legacy J&J environments, which FCM may not have."  (*Id*.)

The parties further agreed that the "clearest definition of the desired work stream outcomes, the efforts required to achieve them and the timing for each project" would be provided during the first three tollgate reviews ("TG1," "TG2," and "TG3"), with TG3 occurring approximately 12 weeks after the Engagement Agreement was signed.  (*Id*. p. 7.)  The TG3 review required approval from both Carlyle and OCD as to "charter/scope, timing & budget," including approval of a "[d]etailed transition plan" and the "[p]rocess maps as required to support transition planning."  (*Id*. pp. 10, 12.)  Prior to the conclusion of the TG3 review, OCD had the option, for any reason, to terminate the Engagement Agreement and avoid all future payments.  (*Id*. p. 7.)  After TG3, OCD had no right to terminate.

FCM presented, and OCD signed off on, the TG3 review by August 2014. (Ex. A.)[1]  The TG3 review clearly states that the "Day 2 countries"—*i.e.*, countries in which OCD required regulatory approval before it could begin operating—were "not in scope."  (Ex. A p. 11; *see also* p. 221.)  In addition, the TG3 review detailed FCM's disputes with J&J, including

---

[1]   Citations to "Ex." are to the exhibits to the accompanying declaration of Aidan Synnott.  The Court may consider the fully executed TG3 review on this motion.  Because the TG3 review provides the "clearest definition" of the terms of the Engagement Agreement (Compl. Ex. A p. 7), it is "integral" to the Complaint.  *See Int'l Audiotext Network, Inc.* v. *Am. Tel & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam).

over "critical" applications, and warned that these disputes could delay the project and increase its cost.  (Ex. A pp. 13, 15-16, 57, 222, 224-227, 239, 258, 332, 335, 337-338, 359, 375.)

### C.    FCM's Work Under the Engagement Agreement

FCM worked on the engagement for almost 11 months: from May 2014 through March 2015.  Some of OCD's IT applications were successfully transitioned during this period. (Compl. ¶ 61.)  But, by October 2014, disputes had arisen between OCD and FCM.  That month, OCD "forc[ed]" FCM to fire its primary subcontractor, which had been responsible for "the entirety of the applications IT solutions."  (*Id.* ¶ 36.)  That same month, FCM allegedly refused to perform work related to several countries in which OCD operates, work allegedly promised by FCM under the Engagement Agreement.  (*Id.* ¶¶ 40-42.)  This refusal allegedly occurred *after* "months of shortcomings," and caused OCD to decide that it "had had enough."  (*Id.* ¶ 4.)  The Complaint also alleges that FCM "made escalating demands on J&J IT personnel for technical assistance under the J&J TSA" and that J&J "became resistant, asserting that much of what FCM demanded was outside the scope of J&J's agreements with OCD."  (*Id.* ¶ 37.)

On December 17, 2014, FCM sent a proposed Statement of Work ("SOW") to OCD.  (Ex. B.)[2]  The SOW stated FCM's position that certain work necessary to stand up a fully independent IT program for OCD was beyond the scope of the Engagement Agreement.  In the SOW, FCM said that it should be paid an additional $19.75 million—on top of the $70 million under the Engagement Agreement—if OCD wanted FCM to perform this work.  (*Id.* p. 11.)  The

---

[2]    The Court may consider the Statement of Work, and the other communications sent or received by OCD, on this motion.  *See Roth* v. *CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014) (per curiam) (on a motion to dismiss, a court may consider "'documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit'" (quoting *Brass* v. *Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  Moreover, the Complaint makes repeated reference to FCM's position that certain work was "out of scope." (Compl. ¶¶ 4, 88-89; *see also id.* ¶¶ 40-42, 72.)  The SOW memorializes that position, and OCD was clearly aware of it when drafting its Complaint.

4

SOW explained that the disputes with J&J, which it detailed extensively, made the agreed-upon lift-and-shift approach impossible and that alternative approaches would be more expensive. (*Id.* pp. 3, 6-9, 13.) Additionally, FCM had not been aware of the "Day 1.5" and "Day 2" countries at the time of its proposal. (*Id.* pp. 3-5.) The SOW also noted that critical OCD employees— who had been staffed on the project at the time of the Engagement Agreement—had since been fired or re-assigned, forcing FCM to hire employees to replace them. (*Id.* p. 10.) Finally, the SOW specifically enumerated costs that would remain out-of-scope (*i.e.*, that would be the responsibility of OCD) even if the SOW were signed. (*Id.* pp. 14-15.)

On December 26, 2014, OCD's COO Robert Yates refused to sign the SOW, arguing FCM was already obliged to perform the work detailed therein under the Engagement Agreement and protesting that the SOW still "excluded important aspects of the project." (Ex. C.) And on January 23, 2015, Yates sent back a "redline" of the SOW, with so many edits that the original SOW was nearly unrecognizable. (Ex. D.) In sum, OCD's counteroffer would have paid FCM much less and required FCM to do much more work. (*Id.*) OCD's proposal also would have expanded FCM's obligations beyond the agreed-upon lift-and-shift approach, requiring FCM to create new applications (as in PwC's competing proposal) and to pay for $11.1 million of software licenses. (*Id.* pp. 1-4, 22.) In addition, Yates's edits addressed the issues of the Day 1.5 and Day 2 countries and the disputes with J&J. (*Id.* pp. 1, 3-5, 7, 14-21.)

At the same time that FCM and OCD were debating these issues, OCD hired KPMG to perform some of the work that FCM had asserted to be out of scope. By March 1, 2015, KPMG told OCD that it would begin developing an "[i]ntegrated project plan with key milestones." (Ex. E p. 13.) As of March 20, 2015, this task was still "[i]n [p]rogress," and, indeed, OCD and KPMG were still considering different options for the type of plan that KPMG

5

would prepare.  (Ex. F pp. 15, 26.)  Moreover, KPGM highlighted the "[l]ack of an integrated plan" as one of the "[c]hallenges" and the fact that a "[d]etailed and integrated program plan [was] not complete" as one of the "[i]ssues."  (*Id.* pp. 22, 24.)

OCD and FCM never signed a SOW.  Instead, they terminated the Engagement Agreement and settled their differences.  During the settlement negotiations, FCM allegedly "prevented OCD from accessing the FCM subcontractors."  (*Id.* ¶ 48.)  As a result, OCD allegedly knew, during the negotiations, that "it could not trust FCM and Habib."  (*Id.*)

**D.     The March 2015 Settlement**

In the March 30, 2013 settlement agreement (the "Settlement"), the parties agreed to terminate the Engagement Agreement.  (Compl. Ex. B ¶ 2.)  The Settlement also contained a release (the "Release") which provided:

> OCD, for itself and its affiliates, agents, representatives, attorneys, administrators, partners, members, managers, officers, directors, employees, shareholders, successors, and assigns, as the case may be, both individually and collectively (the "OCD Parties"), releases, acquits and forever discharges FCM and its affiliates, agents, representatives, attorneys, officers, directors, administrators, partners, members, managers, officers, directors, employees, shareholders, successors and assigns, as the case may be, both individually and collectively (the "FCM Parties"), from any and all claims, actions, causes of actions, suits, obligations, debts, demands, liabilities, damages, costs, expenses, and attorneys' fees ("Claims") whatsoever, whether based in law, equity or otherwise, accruing or originating at any time whatsoever, up to the Termination Date [March 31, 2015], which arise from, concern, or relate in any way to the [Engagement Agreement] or the FCM Parties' performance thereof, save and except the covenants created by this Agreement; and provided, however, that the foregoing release of Claims by the OCD Parties against the FCM Parties only applies to and includes Claims actually known by Martin Madaus, Robert Yates, and/or Garth Marcial, as of the date of this Agreement and no other Claims.

(*Id.* ¶ 8.)  Madaus and Yates are OCD's CEO and COO, respectively.  (Ex. G (OCD press releases).)  Madaus signed the Settlement (Compl. Ex. B p. 8), and Yates received and responded to the SOW (Exs. B-D).  Marcial, OCD's head of IT, signed off on the TG3 review.

(Ex. A pp. 29, 59, 75, 132, 160, 191, 219, 252, 285, 330.)  And Yates and Marcial received KPMG's reports.  (Exs. E-F.)

FCM obtained the aforementioned release only at great cost, both monetary and non-monetary.  As a result of the early termination, FCM had been paid only $31.8 million of the $70 million that would have been due under the Engagement Agreement.  (*Id.* Ex. B ¶ 6.)[3]  In total, the Settlement provided for $14.9 million in further payments from OCD to FCM, including the payments for FCM's continuing transition assistance.  (*See id.* ¶¶ 3, 6.)  Thus, in effect, FCM gave up $23.2 million of the then-remaining $38.2 million owed under the Engagement Agreement.  In addition, FCM was required to incur termination fees by terminating its subcontracts, to waive certain rights under those contracts, and to persuade its subcontractors to deliver general releases to OCD.  (*Id.* ¶ 4.)  FCM also was required to grant OCD a perpetual license to certain of its intellectual property.  (*Id.* ¶ 5.)

Despite extracting such a one-sided deal, OCD still has not lived up to its obligations under the Settlement.  The Complaint's account of what OCD has paid (*see id*. ¶¶ 63-64) reveals that OCD did not pay the $2.45 million that it promised to pay on July 15, 2015 (*see* Compl. Ex. B ¶¶ 3, 6)—not coincidentally, two days before this suit was filed.  In addition, while this case has been pending, $4.8 million more has become due that OCD has not paid.  (*See id.*) This suit represents yet another breach by OCD of the Settlement.

---

[3]   This corresponds to the fixed fees of $4.71 million and $12 million due June 30, 2014 and August 8, 2014, respectively, and the monthly installments of $1.68 million between July 2014 and March 2015.  (*See* Compl. Ex. A. p. 7.)  The Complaint alleges that OCD paid more than $36 million "under the FCM Consulting Agreement."  (Compl. ¶ 63.)  This apparently includes the $5.326 million Settlement payment in satisfaction of FCM's work under the Engagement Agreement.  (*See* Compl. Ex B ¶ 8.)  Much of the $31.8 million received by FCM was not retained by FCM, but rather was paid to subcontractors or spent on out-of-pocket expenses.

## ARGUMENT

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While reasonable inferences may be drawn in plaintiff's favor, mere conclusory statements and "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555. Dismissal is appropriate where plaintiff fails to "'raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

In addition, a "case is mooted upon the 'complete settlement of the underlying causes of action.'" *AngioDynamics, Inc.* v. *Biolitec, Inc.*, 775 F.3d 550, 552-53 (2d Cir. 2015) (per curiam) (quoting *Lake Coal Co.* v. *Roberts & Schaefer Co.*, 474 U.S. 120, 120 (1985)). A moot case must be dismissed under Rule 12(b)(1). *Doyle* v. *Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (per curiam). When subject matter jurisdiction is challenged, plaintiff "bear[s] the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists." *APWU* v. *Potter*, 343 F.3d 619, 623 (2d Cir. 2003). In deciding a motion to dismiss for lack of subject matter jurisdiction, "a district court . . . may refer to evidence outside the pleadings." *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000).

## I.     THE SETTLEMENT RELEASED ALL OF PLAINTIFFS' CLAIMS

### A.     The Settlement Released All Known Claims Related to FCM's Work on the Engagement Agreement

The Settlement is governed by New York law. (Compl. Ex. B ¶ 10.) Under New York law, "[a] settlement agreement is a contract that must be construed in accordance with general principles of contract law." *In re World Trade Center Disaster Site Litig.*, 754 F.3d 114,

121 (2d Cir. 2014). "'[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Id.* (quoting (*Greenfield* v. *Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002))).

Here, the Release is clear and unambiguous. It released "***any and all***" "Claims" "***whatsoever***" "which arise from, concern, or relate ***in any way*** to the [Engagement Agreement] or the FCM Parties' performance thereof," provided that the Claim was "actually known" to Madaus, Yates, or Marcial prior to the Settlement. (Compl. Ex. B. ¶ 8 (emphasis added) (quoted in full *supra* p. 6).) "Claims" is a defined term, including not just "claims," but also "actions, causes of actions, suits, obligations, debts, demands, liabilities, damages, costs, expenses, and attorneys' fees." (*Id.*)[4]

### B.    The Proviso for Unknown Claims Does Not Swallow the Release

A claim is not unknown simply because "every detail of the claim may not have surfaced." *RBS Holdings, Inc.* v. *Wells Fargo Century, Inc.*, 485 F. Supp. 2d 472, 478-79 (S.D.N.Y. 2007) (claims for fraud and breach of implied duty of good faith and fair dealing not unknown despite lack of knowledge as to business relationship between defendant and third-party giving rise to alleged conflict of interest); *see also U.S. Rubber Co.* v. *United States*, 160 F. Supp. 492, 495-96 (Ct. Cl. 1958) (per curiam) (claim for contract reimbursement not unknown despite plaintiff's "inadvertence" in not analyzing data necessary to calculate liability under "novel[]" and "obscure[e]" statute). Rather, a court should consider whether the "central events" or "gravamen of [plaintiff's] alleged injuries" were known at the time of the settlement. *RBS*

---

[4]    The Release applies to Ortho-Clinical Diagnostics, Inc. ("OCD Inc.") and Habib, even though they are not parties to the Settlement. OCD granted a release on behalf of all of its "affiliates" and "agents." (Compl. Ex. B. ¶ 8.) OCD Inc.'s Rule 7.1 corporate disclosure statement expressly disclosed OCD, its indirect parent, as an affiliate. (ECF No. 4.) OCD and OCD Inc. also released, among other people, all of FCM's "officers." (Compl. Ex. B. ¶ 8.) Habib is FCM's CEO. (Compl. ¶¶ 3, 17.)

*Holdings*, 485 F. Supp. 2d at 478-79.  If the central events were known, then "it cannot be said that these claims were unknown." *Id.* at 479; *see also U.S. Rubber*, 160 F. Supp. at 495-96 ("[I]f facts were available but not properly assimilated by plaintiff at the time of the [settlement with exclusion for unknown claims], plaintiff's failure to comprehend their significance . . . does not of itself except them from the force of the release.").

This standard is consistent with the construction given to "known claims" in other contexts.  For example, due process requires actual notice before "known" claims are extinguished.  *Mullane* v. *Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 320 (1950).  For this purpose, claims that are "reasonably ascertainable" are known.  *Mennonite Bd. of Missions* v. *Adams*, 462 U.S. 791, 800 (1983).[5]  Similarly, California has a statute that creates a presumption that general releases in settlements do not reach "unknown" claims.  *See* Cal. Civ. Code § 1542. But claims are not unknown within the meaning of that statute if the facts revealing the claim were "available" to the plaintiff at the time of the settlement.  *See Wilshire Westwood Plaza LLC* v. *UBS Real Estate Sec., Inc.*, 94 A.D.3d 514, 516-17 (1st Dep't 2012); *see also Brae Transp., Inc.* v. *Coopers & Lyrand*, 790 F.2d 1439, 1444 (9th Cir. 1986) (claim not unknown if "dispute" was known, even if "precise facts" unknown).

If a known-claims release could be avoided simply by claiming that plaintiff has learned some new facts in support of a given claim, or gained a new appreciation for previously known facts, then a known-claims release would be no release at all.  Parties will almost always learn more over time.  Indeed, exceptions for unknown claims are not uncommon.  To the contrary, absent an express reference to unknown claims, settlement releases are construed not to

---

[5]   *See, e.g., In re Motors Liquidation Co.*, 529 B.R. 510, 556-60 (Bankr. S.D.N.Y. 2015) (holding that ignition switch defect claims were "known claims," even though GM did not know "which particular car owners" would be injured by the defect).

apply to claims "'outside the parties' contemplation.'"  *RBS Holdings*, 485 F. Supp. 2d at 478

(quoting *Maddaloni Jewlers, Inc.* v. *Rolex Watch U.S.A. Inc.*, 354 F. Supp. 2d 293, 299

(S.D.N.Y. 2004)).  Thus, with too narrow a definition of known claims, settlement would be

"converted into a starting point for renewed litigation," and as a result, "settlement of disputes

would be rendered all but impossible."  *Mangini* v. *McClurg*, 24 N.Y.2d 556, 563 (1969).

### C.    All Plaintiffs' Claims Were Known

In sum and substance, plaintiffs now allege that:

- FCM misrepresented its expertise and abilities.  (Compl. ¶ 77 (fraudulent misrepresentation), ¶ 96 (negligent misrepresentation).)

- FCM refused to perform work promised under the Engagement Agreement.  (*Id.* ¶ 72 (breach of contract), ¶ 88 (breach of the covenant of good faith and fair dealing).)

- FCM got into disputes with J&J regarding FCM's requests for assistance from J&J.  (*Id.* ¶ 88 (breach of the covenant of good faith and fair dealing), ¶ 92 (tortious interference with prospective economic advantage).)

- FCM failed to perform the work promised under the Engagement Agreement and/or falsely represented that it was performing.  (*Id.* ¶ 72 (breach of contract), ¶ 77 (fraudulent misrepresentation), ¶ 82 (fraudulent inducement), ¶ 96 (negligent misrepresentation), ¶ 99 (unjust enrichment).)

- FCM denied OCD access to FCM's subcontractors during settlement negotiations.  (*Id.* ¶ 88 (breach of the covenant of good faith and fair dealing).)

The facts underlying each of these theories were known to OCD prior to the Settlement.

### 1.    OCD Knew About FCM's Qualifications and Abilities

Plaintiffs allege that FCM and Habib misrepresented their qualifications and

abilities.  (*Id.* ¶¶ 77, 96.)  The statements at issue are that Defendants were "world-class,"

"results-driven," a "one-stop shop," and "cutting edge."  (*Id.* ¶¶ 17, 23, 32.)  Assuming that such

statements were otherwise actionable, plaintiffs do not allege that they believed that FCM and

Habib were qualified and able at the time of the Settlement.  To the contrary, plaintiffs allege

that they "spent months trying to accommodate for FCM's and Habib's ***incompetence***" (*id.* ¶ 4

(emphasis added)) and that they were "mindful of FCM's and Habib's shortcomings" during settlement negotiations (*id.* ¶ 6).  While plaintiffs allege that Defendants attempted to shift blame to J&J and FCM's subcontractors (*id.* ¶ 33), any such efforts apparently were not successful. OCD decided that it needed to "remove FCM from the picture" and continue with J&J and FCM's subcontractors to "climb out of the hole FCM had dug."  (*Id.* ¶¶ 43-44.)

## 2.   OCD Knew About the Alleged Repudiation

Plaintiffs also allege that FCM refused to perform work that it had promised to perform in the Engagement Agreement.  (*Id.* ¶¶ 72, 88.)  The work at issue relates to "several of the countries where OCD operates."  (*Id.* ¶ 42.)  The refusal allegedly occurred no later than October 2014, five months prior to the Settlement.  (*Id.* ¶¶ 40-42.)  Indeed, Marcial had earlier agreed that such countries were out-of-scope during the August 2014 TG3 review (Ex. A p. 11, 221), and Yates was again informed of FCM's position that these countries were out-of-scope in the December 2014 SOW (Ex. B pp. 3-5).  Moreover, in refusing to sign the SOW, Yates specifically asserted that it sought additional compensation for work within the original scope of the Engagement Agreement.  (Ex. C.)  Yates also sent detailed line edits to the proposed SOW addressing this precise issue.  (Ex. D pp. 3, 7-8.)  The disputes between OCD and FCM about the scope of the Engagement Agreement were thus well-known to OCD prior to the Settlement.

Indeed, if OCD's interpretation of the Engagement Agreement were correct, FCM's refusal to perform this work would amount to a repudiation, which "alone gives rise to a claim for damages for total breach."  Restatement (Second) of Contracts § 253(1) (1981). Having had full knowledge of a breach of contract claim that, if proven, would have entitled OCD to full contract damages for a total breach, OCD released any contract or non-contract claim for any damages that would have been recoverable for the repudiation.  *See infra* Part I.E.

### 3. OCD Knew About FCM's Disputes with J&J

OCD also alleges that FCM got into disputes with J&J. (Compl. ¶¶ 88, 92.) The substance of these disputes is allegedly that "FCM personnel made escalating demands on J&J IT personnel for technical assistance under the J&J TSA." (*Id.* ¶ 37.) J&J allegedly asserted that "much of what FCM demanded was outside the scope of J&J's agreements with OCD." (*Id.*) OCD knew all about these disputes with J&J prior to the Settlement. The August 2014 TG3 review (signed by Marcial) extensively detailed the disputes with J&J, that many of these disputes related to "critical" applications, and that the disputes might delay the project and increase its cost. (Ex. A pp. 13, 15-16, 57, 222, 224-227, 239, 258, 332, 335, 337-338, 359, 375.) The December 2014 SOW also explained that the J&J disputes had made the agreed-upon lift-and-shift approach impossible for some applications. (Ex. B pp. 3, 6-9, 13.) Yates not only read but proposed specific edits to these portions of the SOW. (Ex. D pp. 4-5, 8-12.) Indeed, the Engagement Agreement itself had disclosed that the project would require irreplaceable efforts from J&J and that access to "legacy J&J environments" was essential. (Compl. Ex. A. p. 5.) The disputes with J&J were thus not a secret.

### 4. OCD Knew that FCM Had Not Performed as Allegedly Promised or Represented

OCD also alleges nonperformance by FCM of the Engagement Agreement and misrepresentations by FCM related to whether it was performing. (Compl. ¶¶ 72, 77-78, 82, 96, 99.) Phrased in the most general terms—which is what the Complaint offers—the nonperformance is alleged to relate to planning, execution, oversight, and progress. (*Id.*) In OCD's view, FCM had "promised to deliver a fully-functioning, independent IT platform for the entire OCD business," and this promise was "not contingent on anything other than OCD's

payment of the agreed price." (*Id.* ¶¶ 25, 31.) In light of all the foregoing, it is entirely implausible that plaintiffs believed that FCM was on-track to deliver on such a promise.

The simple truth is that "OCD did not trust that Defendants had performed on the contract in the manner they represented." (ECF No. 20 at 1.) To the contrary, OCD believed that FCM had breached the contract. (*See, e.g.*, Compl. ¶ 4 (alleging that "OCD spent months trying to accommodate for FCM's and Habib's incompetence in executing the FCM Consulting Agreement"); *id.* (alleging "months of shortcomings"); *id.* ¶ 34 (alleging that "OCD could see that progress was slipping"); *id.* ¶ 35 (alleging that FCM's primary subcontractor was "poorly managed").) And, if OCD knew that FCM was not performing the contract, then it also follows that OCD knew that FCM's alleged statements that it was performing the contract were false. Indeed, OCD specifically alleges that it "knew it could not trust FCM and Habib." (*Id.* ¶ 48; *see also id.* p. 8 (heading: "OCD **Learns** that Habib's and FCM's 'Lift and Shift' Is a '***Bait and Switch***'" (emphasis added)).)

In light of the facts that were known before the Settlement, none of the facts that plaintiffs purportedly learned after the Settlement give rise to a previously unknown claim. *See infra* Part I.D. While OCD purports to have discovered that FCM—and not J&J or the subcontractors—was the "root cause" of the problems already known to OCD (Compl. ¶ 34), under OCD's theories, that fact is immaterial. In OCD's view, FCM was obliged to deliver a complete IT system even if J&J refused to allow its systems to be copied and even if FCM's subcontractors underperformed. (*See id.* ¶¶ 25, 31.)

In reality, whether FCM's performance measured up to its promises and representations was the heart of the dispute that the parties intended to compromise and settle. This is reflected in the text of the Release itself, which expressly refers to Claims "which arise

from, concern, or relate in any way to the [Engagement Agreement] *or the FCM Parties'*

*performance thereof.*" (Compl. Ex. B ¶ 8 (emphasis added).)

### 5.   OCD Knew that Its Request for Access to FCM's Subcontractors Was Denied

OCD's final allegation is that it was denied access to FCM's subcontractors

during settlement negotiations. (*Id.* ¶ 88.) Obviously, OCD would have known that its request

was not granted. (*See id.* ¶ 48.) This was the reason that OCD allegedly could not trust FCM

during settlement negotiations. (*Id.*) Indeed, the denial of this request forms the basis for certain

terms of the Settlement. (*See* Compl. Ex. B ¶ 4.)

### D.   Plaintiffs Fail Plausibly to Allege Post-Settlement Discovery of a Previously Unknown Claim

The Complaint does not allege that, prior to the Settlement, Madaus, Yates, or

Marcial lacked knowledge of any relevant fact. Rather, the Complaint vaguely asserts that

"*[c]ertain* claims amounting to material breach of contract by FCM" were unknown at the time

of the Settlement. (Compl. ¶ 74 (emphasis added).)[6] And the Complaint does not even bother to

include similar conclusory assertions for plaintiffs' other claims. To the contrary, plaintiffs

affirmatively allege that they insisted upon the unknown claims proviso, *not* because they

believed that FCM had performed its contractual obligations and truthfully described its

performance, but rather *because* they believed that FCM *had* breached the contract and lied

about it. (*See* Compl. ¶¶ 6, 47-48; ECF No. 20 at 1 ("OCD did not trust that Defendants had

performed on the contract in the manner they represented.").)

---

[6]   (*See also* Compl. ¶ 50 (vaguely asserting that new facts revealed "depth" and "true extent" of FCM's alleged breach); *id.* ¶ 63 (vaguely asserting that FCM "underperformed, far more so than was known during the negotiations leading to the Settlement Agreement").)

This falls far short of plaintiffs' burden to plausibly allege that they have any claim that was not released by the Settlement.  Nor is this "a case where the information absent from the complaint (assuming its existence) is in defendants' sole possession, such that plaintiffs should be excused from pleading specifics." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *48 (S.D.N.Y. Aug. 4, 2015) (Buchwald, J.).  To the contrary, the issue is the knowledge of OCD's own employees.

The sole facts that plaintiffs claim to have discovered after the Settlement hardly amount to new claims unknown prior to the Settlement:

*First*, OCD claims to have discovered that FCM had not drafted "end-to-end" plans.  (*See* Compl. ¶¶ 45-46, 49, 51-59, 62.)  But the Complaint makes no attempt to explain how this purported fact led to the discovery of a claim that was not already known prior to the Settlement.  In the Engagement Agreement, FCM promised to deliver a "[d]etailed transition plan, including key milestones" to both OCD and Carlyle as part of the TG3 review.  (*Id.* Ex. A p. 12.)  Whether or not FCM's TG3 deliverable adequately discharged FCM's obligations under the Engagement Agreement, its content was known to OCD.  In fact, Marcial signed-off on the plan detailed in the TG3 review.  (*See* Ex. A.)  The Complaint does not allege—because there is none—any promise by FCM to prepare any other plan.  That OCD unilaterally "presum[ed]" the existence of such a plan is insufficient.  (Compl. ¶ 45.)  OCD also knew from KPMG that, even by March 2015, there still was no integrated plan.  (Ex. E p. 13; Ex. F. pp. 15, 22, 24, 26.)  If this fact were "jaw-dropping," as plaintiffs allege (Compl. ¶ 5), then Yates and Marcial's jaws would have dropped when they received the KPMG reports prior to the Settlement.

*Second*, OCD claims to have discovered that certain of FCM's periodic reports regarding which applications had been transitioned were "inflat[ed]" because they included

applications "for which no work was required (e.g., applications that required nothing more than setting up a license on a computer)." (Compl. ¶ 61.) To the contrary, OCD always knew that some applications were easier to transition than others. The TG3 review divided the applications into clear "Migration Categories," such as the "Configure" category for which "no data or application migration is required," and only "[s]ome configuration and license changes may be needed." (Ex. A pp. 14-15.) The Complaint's general allegation of inflated percentages does not identify any particular statement by FCM, does not explain how that statement was false with reference to any particular application, or how such alleged falsity was only discovered after the Settlement. Thus, this vague allegation hardly establishes any newly discovered claim.

As detailed *supra* in part I.C, the Complaint itself, the TG3 review signed by Marcial, the SOW received and edited by Yates, the KPMG reports to Marcial and Yates, and the Settlement signed by Madaus establish that plaintiffs' claims were known. But it is not Defendants' burden to prove plaintiffs' knowledge. Rather, it is plaintiffs' burden to plead a plausible claim and to show, by a preponderance of the evidence, that the Settlement did not moot their claim. Plaintiffs' failure to explain away the facts indicating knowledge further underscores plaintiffs' failure to carry this burden.

**E.      Independently, the Settlement Released All Known Damages**

As used in the Release, "Claims" is a defined term that includes "any and all," among other things, "claims" and "damages." (Compl. Ex. B. ¶ 8.) Any and all "Claims actually known" are released (as opposed to unknown Claims being preserved). (*Id*.) Thus, if

*either* the claim *or* the damages were known, the Claim is released.  Unknown claims for known damages are released, as are known claims for unknown damages.[7]

      Here, plaintiffs claim as damages the payments OCD made to FCM under the Engagement Agreement and Settlement and the payments OCD made to various subcontractors. (*Id.* ¶¶ 63-69.)  Each of these payments were either recited or provided for in the text of the Settlement itself.  (*See id.* Ex. B ¶¶ 3-4, 6.)  Nor does the Complaint allege that the renewal of the J&J TSA—which occurred "shortly after the Settlement Agreement was entered" (Compl. ¶ 66)—was unknown at the time of the Settlement.  Indeed, the KPMG report determined that such an extension was inevitable.  (Ex. F pp. 13-14, 29-34.)  These damages were thus released.

      In short, the Release proviso preserves only unknown claims with unknown damages, and both plaintiffs' claims and plaintiffs' damages here were known.  Plaintiffs' Claims were thus released.

## CONCLUSION

      For these reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

---

[7]   A contrary interpretation, that each item in the definition of Claims must be known, would render the release a nullity.  OCD could not have known, for example, the amount of its attorneys' fees (also part of the definition of Claim) for a not-yet-litigated claim.

Respectfully submitted,

Dated:  New York, New York          PAUL, WEISS, RIFKIND, WHARTON &
        October 19, 2015               GARRISON LLP


        _____s/ Aidan Synnott_____
        Aidan Synnott
        Shane D. Avidan
        1285 Avenue of the Americas
        New York, New York 10019-6064
        Tel.  (212) 373-3000
        Fax  (212) 757-3990
        asynnott@paulweiss.com

        *Attorneys for Defendants FCM, LLC and
        Mitchell Habib*